**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**November 13, 2012**

# In the Court of Appeals of Georgia

A12A1570. IN THE INTEREST OF A.S., A.S., and A.S., children.

BARNES, Presiding Judge.

The father of three minor children appeals from the juvenile court's order finding the children to be deprived and discontinuing reunification services. He contends that the juvenile court erred in finding the children deprived, in admitting hearsay testimony, and in relieving the Department of Family and Children's Services (DFCS) from providing him with reunification services. For the reasons that follow, we affirm.

"On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence

that the children were deprived." (Citation and punctuation omitted.) *In the Interest of G. G.*, 253 Ga. App. 565 (560 SE2d 69) (2002).

In a non-published opinion issued on March 31, 2010, this court affirmed a contempt order issued by the juvenile court against the father in August 2009. *In the Interest of A.S. et al.*, Case Number A10A0292 (Decided March 31, 2010). We noted that the children were subject to the juvenile court's jurisdiction pursuant to orders entered on November 26, 2008 and April 23, 2009, in which the juvenile court found them deprived because they had been exposed to domestic violence. Id. at page 2. The August 2009 contempt order was based on the father's knowing violation of the court's orders that he have no contact with the children until he legitimated them and received the court's permission to visit them, as well as on his conspiring to conceal the children's location and actively hindering the court's ability to place the children in protective custody.

The father argued in the previous appeal that the juvenile court was not authorized to consider any harmful inference from his invocation of the Fifth Amendment and his refusal to answer questions about him living with the mother in Florida or about the location of his children. We disagreed, holding that, "in a juvenile court proceeding such as this, if a party invokes the 5th Amendment, the trial

2

court may infer that a truthful answer would be harmful." Further, in addition to any harmful inferences the juvenile court could draw from the father's refusal to answer questions about the location of the mother and children, the court also based its contempt order on evidence that the father had recently been living with the mother in Florida in violation of court orders and was providing her with financial assistance, which allowed her to keep the children in Florida.

The finding that the father was in contempt is res judicata. See *Rich v. New*, 174 Ga. App. 73, 74 (329 SE2d 176) (1985). The father is also bound by the findings that, at the time of the previous unappealed orders, the children were then deprived for the reasons given in the orders, and the trial court in this proceeding properly considered the facts judicially established during the previous deprivation proceedings. *In the Interest of J.A.*, 286 Ga. App. 704, 706-707 (649 SE2d 882) (2007); *In the Interest of B. P.*, 207 Ga. App. 242, 244 (427 SE2d 593) (1993). We reiterate some of those facts here because they are relevant to whether clear and convincing evidence supports the juvenile court's October 2011 order finding the children deprived and discontinuing reunification services.[1]

---

[1]The mother has not appealed from the current deprivation order.

The father began having sexual relations with the mother when she was fifteen and he was in his mid-forties. She moved in with the father when she was sixteen and four months pregnant. He had never physically abused her before she moved in with him, "just verbally and stuff," but after she moved in he began choking and hitting her.

By August 2008, the father and mother had two children, age one and two, who entered shelter care and were temporarily placed in the custody of Cobb County DFCS. The mother had left them with the father after he became physically abusive to her in the car with the children present. She did not remember the children's reactions then, but they were usually scared and crying when the father became angry at the mother.

After a hearing in November 2008, the juvenile court found that the mother was the children's only legal parent and had stipulated that they were deprived by exposure to domestic violence. The court placed the children in the mother's custody, ordered her to live with them at her aunt's residence, and ordered that the father have no contact with them until he had legitimated them, sought visitation and received court approval. At that time the father was incarcerated on charges of child

molestation, statutory rape, and aggravated sexual battery against the children's mother when she was fifteen.

The juvenile court scheduled a hearing in January 2009 to review the placement and consider the father's legitimation petition, but the parties agreed to continue it until March 2009. The court then continued the March 2009 hearing because the mother was expecting a third child with the father, a psychologist report on the father had not been completed, and the parties wanted to take each other's depositions.

After the third child was born on March 18, 2009, DFCS was granted an expedited hearing to determine if she was also deprived, whether the mother had moved from her aunt's house, and whether the father was violating the previous custody order by having contact with the older two children. In April 2009, the juvenile court issued its order finding the third child deprived, noting that the father chose not to appear at a hearing on March 23, 2009 to consider the deprivation petition, although his counsel had appeared at a separate hearing on his request to depose the mother. The court ordered that the father have no contact with any of the three children until he legitimated them and had sought and received the court's permission to visit them.

In May 2009, the CASA reported that the mother had called to relay that her relative had put her and the children out, but would not reveal her current location. The mother failed to appear at a hearing on May 12, 2009, and the juvenile court issued an ex parte order immediately placing the children in temporary protective custody with DFCS because the mother and children had moved from the relative's residence. The court ordered the sheriff to locate the children.

The mother testified that the father told her in June or July 2008 not to take the children to court again because she had lost custody of them. He took her and the children to a small motel somewhere in Georgia and left her there, then eventually took them to live in a motel in Florida. The father stayed with her "off and on" during this time, and she was working as an adult entertainer. He married the mother in Florida on June 26, 2009, because by doing so he automatically legitimated the children, and had their birth certificates amended to reflect that he was their father. He left the children with their mother in Florida and returned to Georgia "a couple of days after the marriage."

On July 9, 2009, DFCS asked the juvenile court for an expedited hearing to review the children's placement, having received information that the mother and children were in Florida and the father had been in contact with them. DFCS also

6

moved the court to issue an arrest warrant for the mother based on her violations of the protective order, submitting as exhibits a Florida police report of a burglary at an Orlando hotel and copies of the mother's and father's driver's licenses obtained from the hotel. The police did not locate the children, but found a note in the hotel room, apparently from the mother, in which she says she was very ill mentally, was trying to detach from her children so she could give them up, and had thoughts of killing the children "in the least painful way possible" so she could "know they are in heaven and not being abused." The juvenile court issued an arrest warrant for the mother on July 10, 2009, but the location of the mother and children remained unknown.

After the police came to the Florida hotel looking for the father, he gathered the mother and children and took them to Greenville, South Carolina, where the mother remained "in hiding with the kids." She testified that during the four years she lived with the father, he committed ongoing "layers" of abuse, which always included "his main thing," choking. She was completely dependent on the father financially.

On August 2009, the father was being held for a bond revocation related to the charges involving the mother while she was fifteen, and DFCS successfully petitioned the court for an expedited hearing to call the father for cross-examination to determine where the children were located. During the August 19, 2009, hearing, as

7

described earlier, the father invoked his Fifth Amendment privilege against self-incrimination, and the court found him in willful contempt. The juvenile court ordered the father to remain incarcerated for 20 days.

The father was released from jail in mid-September 2009, when the court dismissed the contempt charges against him. While the father filed a notice of appeal of the contempt citation on September 17, 2009, he failed to appear at a juvenile court hearing on September 29, 2009. The juvenile court continued the hearing based on representations from the father's attorney that he had mis-communicated the date to the father, but the father did not appear at the rescheduled hearing on October 5, 2009, either. His attorney had no explanation for the father's failure to appear, and the juvenile court issued a bench warrant for the father's arrest on November 6, 2009.

The children remained missing for 18 more months, during which time the father send multiple letters to the juvenile court proclaiming his love and care for the children, along with pictures, medical records, and other documentation, none of which disclosed their location. The court delivered the missives unread to the detective who had been involved in the case since 2008 and who had been trying to locate the children since May 2009.

In January 2011, DFCS moved the court to review the disposition placement and consider whether to dismiss its deprivation petition without prejudice and relieve the department of custodial responsibility of the children, as their whereabouts were unknown and it was impossible for the department to provide them with foster care services. The court held a hearing and denied the motion. Shortly after that, the father sent a medical report to the court or to DFCS that included his address in North Carolina. The investigating detective instigated a process through which the father was located and arrested on March 17, 2011 for interference with custody. He was released on bond shortly after he was arrested, but the children had already been placed with Youth and Family Services (YFS) in North Carolina. After a hearing on March 22, 2011, the North Carolina court determined that jurisdiction of the children was properly with the Cobb County, Georgia court and ordered YFS to return them to Cobb County DFCS.

The children were returned to DFCS custody, and on March 24, 2011, DFCS filed a petition alleging the children were deprived and seeking to change the parenting plan to non-reunification. The juvenile court specially set a deprivation hearing for May 12, 2011, and a new attorney made an entry of appearance for the father. The father requested discovery and a continuance, which the court granted in

an order finding that the children remained deprived because the father was in jail and the mother had not been located and was believed to be homeless. The order also noted that the court's previous order giving DFCS temporary custody of the children was set to expire on May 21, 2011 and ordered that DFCS custody be extended to May 21, 2012.

The court heard the deprivation petition and motion to establish a case plan of non-reunification on June 28, 2011, August 9, 2011 and August 10, 2011.[2] At the hearing, the father stipulated that the children could not live with him at that time because he was incarcerated on the interference with custody charge and was not working.

When asked if he had known where the children were located at the time of the hearing in August 2009, two weeks after his marriage, he responded, "I can't say at this time that I knew exactly where they were at that time." He also did not tell the court he had legitimated the children. He testified that he was released from jail on the contempt charge in mid-September 2009, and within a month he was living in a hotel in South Carolina with the mother and children. That month, he testified, the

[2]On June 28, 2011, DFCS filed notice of its intention to petition to terminate both parents' parental rights.

10

mother "said she no longer wanted to be around the children or me," and she left them. He filed a divorce petition in January 2011, which he served on the mother at a shelter after he found her on Facebook, and the divorce became final in March 2011.

The father further testified that he did not know he was supposed to bring the children back to the court, because he thought that when he legitimated them, his "rights" to the children superceded any previous court order regarding custody. He repeatedly asserted that he was under no court order regarding the children, because the initial proceedings involving the mother and children described him as the "putative" father, and the case plans only directed him to legitimate the children, which he did. He testified that, after he sent the DFCS caseworker all the paperwork showing he had married the mother and legitimated the children, the caseworker told him he only needed to call her once a month. Despite pointed questioning from the juvenile court, the father could not explain why he sent letters to the court while the children were missing in which he repeatedly asked the court not to take the children from him. The juvenile court noted that the father did not include any return addresses on any of the letters he sent the court after he left Georgia.

The mother, who was 23 at the time, was located in a North Carolina jail after the first day of the hearing, and was present during the last two days. She testified that she finally left the father in South Carolina in September 2009 and went to a homeless shelter after an incident in which the father became angry with her for "looking at a guy or something" at a mall. She explained that the father "just got into . . . one of his moods and looks, . . . thinking I was looking at someone and I wasn't." She recognized the signs of impending trouble from prior incidents of abuse, and testified, "And I just couldn't do it anymore. . . . I just left and he had the kids." She visited them once in January 2010, and the children were well-cared-for, although she herself did not feel safe in the father's house. She testified she only saw him hit one of the children inappropriately once, when "he popped [the child] on the mouth when she kept crying" and the father would not let the mother pick her up, but that generally he was a good father.

DFCS presented evidence at the deprivation hearing that in 1986, the father pled guilty to three separate incidences of lewd and lascivious conduct for masturbating in the presence of three different minor victims, and was sentenced to three and a half years, of which he served 287 days in custody. The father was subsequently indicted in Ohio in 1988 for two counts of rape and one count of

kidnapping involving an ex-girlfriend, and he pled guilty in 1989 to reduced charges of two counts of "gross sexual imposition" and one count of abduction. He pled guilty and served 17 months in prison, was released on probation, then in 1991 his probation was revoked for reasons not apparent in the record. He remained incarcerated until July 2000. Three years later, the father met and began having sex with the mother when she was fifteen.

On redirect on the last day of the deprivation hearing, the father testified that after the mother walked off in October 2009, he lived with the children in a motel room until he reestablished his business and moved into a house. He further testified that the children were enrolled in private school and were doing well, and argued that no one had ever introduced any evidence that he was an unfit parent. He testified he had never been convicted of domestic violence, and said several times over the course of the hearing that the ongoing court proceedings were a "personal vendetta" against him. He admitted during cross-examination, however, that the "gross sexual imposition" and abduction charges to which he had pled guilty in 1989 involved his ex-girlfriend.

Regarding his prior convictions for sexual offenses, the father asserted they were irrelevant to the question of whether the children were currently deprived,

because he committed the offenses "a long time ago," had undergone treatment, and had changed. The mother testified that, while she was not concerned about her children's safety with the father, two incidents with other children seemed "weird" or "strange." When they lived in Cobb County the father used to take food to a nine- or ten-year-old girl's house while her parents were at work, which she thought seemed inappropriate. Another time he directed her to take the children into their hotel room while he remained in the pool with two unescorted children, who were also about nine. The mother stipulated at the hearing that she could not care for the children because she was in custody and had not seen them since January 2010.

The foster mother testified about several incidents in which the two older children, then four and five, said odd things of a sexual nature. The first time, within two weeks of their coming to live with her, she heard them in the back seat of the car talking about "cookies and peepee." When she asked them what that meant, the five-year-old said, "[Y]ou know, that's when Daddy and Jessica are naked under the covers making umm, umm, umm noises," and then asked, "Am I going to do that?" "Jessica" had introduced herself at the beginning of the hearing as the father's "nanny/girlfriend," and the father testified that he had hired her to watch the children while he worked. In the living room on another occasion, the five-year-old defined

14

"cookies and peepee" as "when Daddy put his peter in [Jessica's] vagina." In another incident, the five-year-old pointed to a Ken doll's private parts and told her brother, "[Y]ou can eat that." On a different day, the brother described a jogger without a shirt on as naked, and the foster mother corrected him because the jogger was wearing shorts. The child volunteered, "Daddy sometimes walks around the house in his underwear and sometimes without the underwear."

In a 30-page written order, the trial court found clear and convincing evidence the children were currently deprived based on eight findings of fact: (1) neither parent could care for the children as both were incarcerated; (2) the father's contemptuous behavior in hindering the juvenile court from exercising its jurisdiction over the children for almost two years placed them at risk; (3) the father had a history of sexually deviant behavior toward both adults and children; (4) the father repeatedly abused the mother physically in the presence of the children during the four years she lived with him, which made them cry; (5) the parents violated the court's previous orders, by the mother allowing the father to have contact with the children and the father helping the mother hide the children from the court, which revealed a "careless disregard for the safety and well being of the children which is indicative of their inability to provide appropriate care"; (6) the mother had a history of a nomadic

15

lifestyle, moving from relatives' houses, hotels, shelters, and returning to the abusive father, and had no means or ability to support them; (7) the mother had expressed thoughts of harming the children to free them from the father's abuse; and (8) the children would suffer inevitable neglect and / or injury if allowed to remain in the control of either parent.

The father filed a notice of appeal, and the court subsequently held a permanency hearing and issued an order denying the father's request for visitation and establishing concurrent case plans of reunification, placement with a relative, guardianship by a non-related person, or adoption through termination of parental rights, depending indirectly on the outcome of this appeal. The father also challenges that order in his appeal.

1. The father argues that the juvenile court erred in finding that clear and convincing evidence showed the children were presently deprived, addressing each of the court's findings related to him.

A "deprived child" is one who:

(A) Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals;

16

(B) Has been placed for care or adoption in violation of law;

(C) Has been abandoned by his or her parents or other legal custodian; or

(D) Is without a parent, guardian, or custodian.

OCGA § 15-11-2 (8). This court reviews the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that a child was deprived, and whether, under the circumstances, the court properly awarded temporary custody of the child to someone other than the parent. *In the Interest of M.K.*, 288 Ga. App. 71, 71 (1) (653 SE2d 354) (2007). "This Court neither weighs the evidence nor determines the credibility of witnesses. We instead defer to the trial court's fact finding and affirm unless the appellate standard is not met." *In the Interest of D. A.*, 240 Ga. App. 561, 562 (524 SE2d 248) (1999).

The juvenile court issued numerous previous orders, which it took into consideration in issuing this deprivation order. The two previous unappealed orders adjudicating the children deprived bind the parents to the finding that the children were then deprived for the reasons given in the orders. *In the Interest of R.C.M.*, 284 Ga. App. 791, 799, fn. 6 (645 SE2d 363) (2007). Additionally, as discussed

17

previously, this court affirmed the father's criminal contempt citation for hiding the children from the court's jurisdiction. *In the Interest of A.S.* The father concedes on appeal that he was unable to have contact with the children as of August 2011 due to the conditions of his bond for interference with custody, but argues that none of the court's other findings establish *current* deprivation. To the contrary, he asserts, the juvenile court failed to make any connection between the children's present status and his previous contemptuous behavior, his history of sexually deviant behavior, his abuse of the mother, his violation of prior court orders, and his lack of credibility.[3] The court simply concluded that the children would suffer inevitable neglect or injury, he contends, which was not a finding that they were currently deprived.

That the father was unable to provide parental care and control of the children at the time of the deprivation hearing because of the conditions of his bond constitutes clear and convincing evidence that supports the juvenile court's conclusion that the children were deprived. Aside from that fact, if the father's arguments were valid, then a parent or putative parent could hide his deprived

---

[3] While the father stated in his appellate brief that his bond condition had been modified to allow him contact with the children, and DFCS stated in its brief that he had been incarcerated since April 2012 for new offenses, the record itself contains no evidence with regard to either claim.

children from the juvenile court for an extended length of time, and then, when they were found, assert that the court could not prove that the children were deprived because the court had no information about the children's current living conditions.

The father moved the children to three different states while he was hiding them from the juvenile court and from DFCS review. Of course DFCS could not introduce evidence about the status of the children's parental care, control, subsistence, or education necessary for their physical, mental, or emotional health when they were with their father, because DFCS did not know where they were. The evidence did show that the children had no contact with their mother when they were found, because the father had physically and mentally abused her until she left the children to escape him. Further, the juvenile court specifically found that the father "forwarded correspondence to this court in an apparent attempt to influence the decision in regard to the children's placement, and it is disingenuous for [the father] to assert he does not know the children remain under the jurisdiction of" the juvenile court.

The evidence, as reviewed previously, was sufficiently clear and convincing to enable the trier of fact to find that the children were presently deprived.

2. The father argues that the juvenile court erred in allowing the foster mother to give hearsay testimony about statements the children had made to her. At the end of the first day of hearing, when DFCS asked the foster mother if the children had made any statements "which are sexual in nature toward their father," the father objected, on the ground that the statements were not admissible under the Child Hearsay Statute. DFCS responded that the evidence was admissible as statements by the children against their interest in maintaining the parental relationship with their father, and the court took the matter under advisement.

When court reconvened, DFCS argued that the foster mother's testimony about statements the children made to her was admissible under either the hearsay exception of party admissions against interest or under the Child Hearsay State, OCGA § 24-3-16. The court directed DFCS to bring the children to the courthouse so they would be "available," and once they were, DFCS again called the foster mother to the stand. The court overruled the father's objection to the question whether the children had made statement to the foster mother "regarding sexual information," and the foster mother testified about the children's statements as described previously. On appeal the father argues that the trial court abused its discretion in allowing the testimony

because the children were not victims of abuse and the statements did not involve any acts of abuse, and therefore the Child Hearsay Statute did not apply.

OCGA § 24-3-16 provides that a statement by a child under 14 "describing any act of sexual contact . . . performed with or on another in the presence of the child is admissible in evidence by the testimony of the person or persons to whom made if the child is available to testify in the proceedings and the court finds that the circumstances of the statement provide sufficient indicia of reliability." "[T]he child is 'available to physically appear' if the child is in the courthouse and 'available if necessary' to be called as a witness." (Citation omitted.) *In the Interest of A.T.*, 309 Ga. App. 822, 826 (711 SE2d 382) (2011).[4]

Here, the statements described acts of sexual contact performed with another person in the child's presence. The children were physically in the courthouse and thus available to testify. The juvenile court found them competent to testify under the provisions of OCGA § 24-9-5 (b), which provides that "in all cases involving

_____

[4]The father did not raise a Confrontation Clause issue during the hearing, and even if he had, the children's statements to the foster mother were nontestimonial in nature. Therefore, we need not consider whether DFCS was required to call the children to testify. See *Bunn v. State*, 291 Ga. 183, 189 (2) (b), n. 4 (728 SE2d 569) (2012); *Hatley v. State*, 290 Ga. 480, 484-485 (11) (722 SE2d 67) (2012).

deprivation as defined by Code Section 15-11-2 . . . any such child shall be competent to testify." We find no error.

3. Finally, the father argues that the juvenile court erred in finding "clear and convincing evidence that reasonable efforts to reunify the children with a parent would be detrimental to the children and reunification services, therefore, should not be provided."

As with orders finding deprivation, on appeal from a juvenile court order discontinuing reunification services to a parent, we construe the evidence in the light most favorable to the juvenile court's findings. *In the Interest of J. B.*, 274 Ga. App. 564 (618 SE2d 187) (2005). OCGA § 15-11-58 (h) provides that when reviewing a DFCS decision to pursue a nonreunification plan, the juvenile court "shall determine by clear and convincing evidence whether reasonable efforts to reunify a child with his or her family will be detrimental to the child and that reunification services, therefore, should not be provided or should be terminated." The statute also provides that reasonable family reunification efforts "shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that . . . [t]he parent has subjected the child to aggravated circumstances which may

include *but need not be limited to* abandonment, torture, chronic abuse, and sexual abuse. OCGA § 15-11-58 (a) (4) (A).

The father argues that the juvenile court in this case failed to make specific findings of fact that efforts toward reunification would be detrimental, but held simply that "the evidence which supports the establishment of a case plan of non-reunification includes" the eight specific findings supporting the deprivation conclusion. The father also argues that the juvenile court never entered a reunification plan that was directly addressed to him, and that he complied with the directives in the mother's case plans requiring that he legitimate the children, pay for their support, and provide relative placement options. Because he married the mother and legitimated and supported the children, he contends, he did everything the court wanted him to do. Further, he argues, "protective orders are not included in OCGA § 15-11-58 (h) (1), which refers specifically to case plans for reunification," and therefore failure to comply with those orders does not create a presumption under the statute that reunification services should not be provided.

In other words, the father argues that after preventing DFCS from preparing a reunification case plan for him by hiding the children from the juvenile court from May 2009 until they were found in March 2011, the law requires that he be allowed

to start over as if he had never taken the children and their mother and hid them from the court.

We disagree. Under OCGA § 15-11-58 (a) (4) (A), the juvenile court may determine that reasonable efforts at family reunification are not required due to aggravating circumstances. The juvenile court in this case made specific findings of fact that the father conspired with the mother to defy the court's protective conditions and placed the children at risk of neglect and abuse while he concealed their whereabouts. It found that the establishment of a non-reunification case plan was supported by the fact that the parents "failed and refused to comply with prior protective conditions of this court which were designed to reunify the children with their mother." The father exposed the children to unstable living environments, moving them and their mother from state to state while hiding from the court. The father physically abused the mother, sometimes in the children's presence, until she finally left the children with him because "he was the one with the money" and she did not want to move them from shelter to shelter. The father thus exposed the children to repeated episodes of violence and deprived them of their relationship with their mother. Finally, the father also has a history of sexual deviancy and began sleeping with the mother when she was still a minor.

24

Considering the evidence and the juvenile court's findings of fact, the juvenile court did not err in finding "by clear and convincing evidence that reasonable efforts to reunify the children with a parent would be detrimental to the children and reunification services, therefore, should not be provided."

*Judgment affirmed. Adams and McFadden, JJ., concur.*